## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

REBECCA KROH,

               Plaintiff,

       v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

           Defendant

CIVIL ACTION NO. 3:13-CV-01533

(MEHALCHICK, M.J.)

### MEMORANDUM OPINION

This is an action brought under Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the Plaintiff's claim for disability insurance benefits under the Social Security Act. The matter has been referred to the undersigned United States Magistrate Judge on consent of the parties, pursuant to the provisions of 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 16; Doc. 17). For the reasons expressed herein, the Commissioner's decision shall be **REVERSED** and **REMANDED** for further proceedings.

## I.  PROCEDURAL HISTORY

On August 29, 2010, Plaintiff Rebecca Kroh filed an application for disability insurance benefits alleging that she became disabled on February 28, 2009, due to anxiety and severe depression. Ms. Kroh's initial application was denied on December 23, 2010, and she timely requested a hearing before an administrative law judge ("ALJ"). On January 5, 2012, Ms. Kroh appeared with her attorney for an administrative hearing before ALJ Michele Stolls. On January 30, 2012, the ALJ denied Ms. Kroh's application for disability

insurance benefits, finding that she was capable of performing her past relevant work as a laborer in the water bottling business. Ms. Kroh requested administrative review of the ALJ's decision by the Appeals Council of the Office of Disability Adjudication and Review, submitting approximately 300 pages of additional medical records in support of her claim for benefits. The Appeals Council denied her request for review on April 10, 2013. This makes the ALJ's January 30, 2012, decision the "final decision" of the Commissioner subject to judicial review  under 42 U.S.C. § 405(g). 20 C.F.R. § 404.981.

Ms. Kroh appealed the Commissioner's final decision by filing the complaint in this action on June 7, 2013. (Doc. 1). The Commissioner filed her answer to the complaint on August 9, 2013. (Doc. 8). Together with her answer, the Commissioner filed a transcript of the administrative record in Ms. Kroh's case. (Doc. 9). The matter is now fully briefed by the parties and ripe for decision. (Doc. 10; Doc. 13).

## II.  STANDARD OF REVIEW

When reviewing the denial of disability benefits, the Court's review is limited to determining whether those findings are supported by substantial evidence in the administrative record. *See* 42 U.S.C. § 405(g) (sentence five); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v.*

*Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). The question before the Court, therefore, is not whether Ms. Boggs is disabled, but whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The [Commissioner]'s determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

To receive disability benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a). To satisfy this requirement, a claimant must have a severe physical

or mental impairment[1] that makes it impossible to do his or her previous work or any other substantial gainful activity[2] that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).

The Commissioner follows a five-step sequential evaluation process in determining whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a). Under this process, the Commissioner must determine, in sequence: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment;[3] (4) whether the claimant is able to do past relevant work, considering his or her residual functional capacity ("RFC");[4] and (5) whether the claimant is able to do any other work, considering his or her RFC, age, education, and work experience. 20 C.F.R. § 404.1520. The claimant bears the initial burden of demonstrating a medically determinable impairment that prevents him or her from doing past relevant work. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 404.1512; *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). Once the

---

[1] A "physical or mental impairment" is an impairment resulting from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

[2] "Substantial gainful activity" is work that (1) involves performing significant or productive physical or mental duties, and (2) is done (or intended) for pay or profit. 20 C.F.R. § 404.1510.

[3] An extensive list of impairments that warrant a finding of disability based solely on medical criteria, without considering vocational criteria, is set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1.

[4] "Residual functional capacity" is the most a claimant can do in a work setting despite the physical and mental limitations of his or her impairment(s) and any related symptoms (e.g., pain). 20 C.F.R. § 404.1545(a)(1). In assessing a claimant's RFC, the Commissioner considers all medically determinable impairments, including those that are not severe. 20 C.F.R. § 404.1545(a)(2).

claimant has established at step four that he or she cannot do past relevant work, the burden then shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy that the claimant could perform consistent with his or her RFC, age, education, and past work experience. 20 C.F.R. § 404.1512(f); *Mason*, 994 F.2d at 1064.

## III. THE ALJ'S DECISION

In her January 30, 2012, decision, the ALJ determined that Ms. Kroh met the insured status requirement[5] of the Social Security Act through June 30, 2014. (Admin. Tr. 291, Doc. 9-4, at 60). At step one of the five-step process, the ALJ determined that Ms. Kroh did not engage in any substantial gainful activity between her alleged onset date of February 28, 2009, and the date of the ALJ's decision. (Admin. Tr. 291, Doc. 9-4, at 60). At step two, the ALJ determined that Ms. Kroh had the following severe impairments: major depressive disorder, cyclothymic disorder, social phobia, generalized anxiety disorder, and panic disorder with agoraphobia. (Admin. Tr. 291, Doc. 9-4, at 60). The ALJ also considered several other health conditions found in the claimant's medical history, finding each to be non-severe. (Admin. Tr. 291–92, Doc. 9-4, at 60–61). At step three, the ALJ determined that Ms. Kroh did not have an impairment, or combination of impairments, that met or medically equaled the severity of any one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Admin. Tr. 292–93, Doc. 9-4, at 61–62).

Prior to step four, the ALJ determined Ms. Kroh's RFC based on the evidence of record, including the claimant's testimony, the findings and opinions of treating and

---

[5] "Under 20 C.F.R. § 404.131, [a claimant] is required to establish that he became disabled prior to the expiration of his insured status." *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990).

examining medical sources, and the opinions of a non-examining state agency medical consultant. The ALJ determined that Ms. Kroh retained the RFC to perform the full range of work at all exertional levels defined in 20 C.F.R. § 404.1567, with certain non-exertional limitations. (Admin. Tr. 293–98, Doc. 9-4, at 62–67). Specifically, the ALJ found that:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitiations: she is limited to occupations requiring no more than simple, routine tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few work place changes. The claimant is limited to occupations which require no more than occasional interaction with supervisors and coworkers, but no interaction with members of the general public[,] although she can be in proximity to the public. She is limited to occupations which require low stress, defined as occasional decision-making required and occasional changes in work setting.

> (Admin. Tr. 293, Doc. 9-4, at 62).

> Pursuant to 20 C.F.R. § 404.1529(c) and Social Security Ruling 96-7p, 1996 WL 374186, the ALJ considered Ms. Kroh's testimony and found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Admin. Tr. 296, Doc. 9-4, at 65).

The ALJ considered the initial Disability Determination Rationale, prepared by a state agency disability examiner who was not a physician or psychologist. (Admin. Tr. 297, Doc. 9-4, at 66). On December 22, 2010, based on a review of Ms. Kroh's medical treatment records, several medical opinions, and a third-party function report provided by Ms. Kroh's mother, disability examiner Jillian Shambaugh found no physical impairment severe enough to limit Ms. Kroh's physical or mental ability to perform basic work activities. (Admin. Tr. 352, Doc. 9-5, at 2). Ultimately, the ALJ afforded "no weight" to the

state agency disability examiner's opinion because it was a non-medical opinion. (Admin. Tr. 297, Doc. 9-4, at 66).

Pursuant to 20 C.F.R. § 404.1527(e) and Social Security Ruling 96-6p, 1996 WL 374180, the ALJ considered a state agency assessment of Ms. Kroh's mental RFC, prepared by a medical consultant who is also an expert in Social Security disability programs, as the medical opinion of a non-examining medical source. (Admin. Tr. 297, Doc. 9-4, at 66). On December 15, 2010, medical consultant Mitchell Sadar, Ph.D., found that Ms. Kroh suffered from major depressive disorder and generalized anxiety disorder. (Admin. Tr. 560, Doc. 9-10, at 61; Admin. Tr. 562, Doc. 9-10, at 63; Admin. Tr. 565, Doc. 9-10, at 66; Admin. Tr. 567, Doc. 9-10, at 68). The medical consultant assessed Ms. Kroh's limitations in four functional areas as a result of her mental disorders, finding mild limitations in her activities of daily living and her social functioning, moderate limitations in her concentration, persistence, or pace, and no episodes of decompensation. (Admin. Tr. 572, Doc. 9-10, at 73). *See generally* 20 C.F.R. § 404.1520a(c) (explaining functional limitation rating process for mental impairments); 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C) (explaining the four functional areas). The medical consultant further found that:

> The claimant's ability to understand and remember complex or detailed instructions is limited, however, she would be expected to understand and remember simple one and two step instructions. Her basic memory processes are intact. She can understand, retain, and follow simple job instructions, i.e., perform one and two step tasks. She can make simple decisions. Moreover, she could be expected to complete a normal workday without exacerbation of psychological symptoms. Her impulse control is adequate. Additionally, she is able to maintain socially appropriate behavior and can perform the personal care functions needed to maintain an acceptable level of personal hygiene. She is able to interact appropriately with the general public. She is capable of asking simple questions and accepting instruction. She is able to maintain socially appropriate behavior. Furthermore, she can sustain an ordinary routine without special supervision. She can function in production oriented jobs requiring little independent decision making. The limitations resulting

from the impairment do not preclude the claimant from performing the basic mental demands of competitive work on a sustained basis.

(Admin. Tr. 560, Doc. 9-10, at 61).

The medical consultant noted that his assessment was based in part on the prior assessment of examining psychologist David O'Connell, but that it rejected Dr. O'Connell's assessment to the extent that O'Connell found marked limitations to Ms. Kroh's social functioning, as that rating was not supported by Dr. O'Connell's narrative report. (Admin. Tr. 560–61, Doc. 9-10, at 61–62). Ultimately, the ALJ afforded "great weight" to the state agency medical consultant's opinion, but included additional limitations in Ms. Kroh's RFC determination based on unspecified objective medical evidence of record. (Admin. Tr. 297, Doc. 9-4, at 66).

Pursuant to 20 C.F.R. § 404.1527(c), the ALJ considered the medical opinion of David F. O'Connell, Ph.D., a psychologist and consultative examiner for the same state agency. (Admin. Tr. 297, Doc. 9-4, at 66). On November 30, 2010, Dr. O'Connell examined Ms. Kroh and provided an assessment of her mental status and resultant functional impairments. (Admin. Tr. 550–57, Doc. 9-10, at 51–58). Dr. O'Connell's report provided a review of Ms. Kroh's medical, personal, and vocational history, apparently self-reported by the claimant. (Admin. Tr. 554–56, Doc. 9-10, at 55–57). Dr. O'Connell then provided an assessment of Ms. Kroh's mental status, based on his personal observations as well as self-reported information:

> The claimant presents herself cooperatively. Affect was appropriate to ideation with a constricted range and blunted in its expression. Mood was one of profound depression and anxiety. She showed moderate psychomotor slowness. She reports a response to medications, but never a full remission and, over time, shows diminished response to medications and her symptoms appear to come back to initial levels.

She denied current suicidal, parasuicidal, homicidal thoughts, feelings, plans, or impulses. Intelligence is judged to be in at least the average range. There [are] no dysregulations in moods or affects. There were no obvious cognitive perceptual speech or language disturbances.

Sensorium was clear. She had a good fund of knowledge. Abstract response to proverbs such as "People who live in glass houses shouldn't throw stones," she states, "You should not judge people, especially if you are doing the same thing they are."

She could repeat six digits forward. She was an accurate calculator. Comprehension was intact. She was able to describe how a house made of stone was better than one made of wood.

Judgment was sound. She would mail an envelope she found in the street and call 911 if her neighbor's house was on fire.

Recent, immediate, and remote memory were grossly intact. She was alert, coherent, and oriented in all spheres.

Impulse control was sound. She seems a reliable source of information about herself.

(Admin. Tr. 556, Doc. 9-10, at 57).

Based on his examination, Dr. O'Connell provided a clinical diagnosis of Ms. Kroh as suffering from: major depressive disorder, continuous without psychotic features; generalized anxiety disorder; and panic disorder without agoraphobia. (Admin. Tr. 556, Doc. 9-10, at 57). He further diagnosed Ms. Kroh with avoidant and obsessive compulsive personality features. (Admin. Tr. 557, Doc. 9-10, at 58). Dr. O'Connell identified Ms. Kroh's history of irritable bowel syndrome and migraine headaches as physical medical conditions that may affect her mental disorder. (Admin. Tr. 557, Doc. 9-10, at 58). He identified Ms. Kroh's unemployment, her financial problems, her chronic medical problems, and her chronic psychiatric problems as environmental or psychosocial problems

that affect the care of her mental disorder.[6] (Admin. Tr. 557, Doc. 9-10, at 58). Dr. O'Connell assessed Ms. Kroh's overall function, assigning her a current Global Assessment Function ("GAF") score of 30.[7] (Admin. Tr. 557, Doc. 9-10, at 58). Dr. O'Connell concluded that Ms. Kroh's prognosis was "[g]uarded-to-poor." (Admin. Tr. 557, Doc. 9-10, at 58).

Dr. O'Connell's narrative report addressed Ms. Kroh's limitations in three out of the four functional areas identified by the Social Security regulations. *See generally* 20 C.F.R. § 404.1520a(c); 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C). With respect to activities of daily living, he found  that Ms. Kroh could "shop, cook, clean, take care of personal hygiene, and take care of her household." (Admin. Tr. 557, Doc. 9-10, at 58). With respect to her social functioning, he found that Ms. Kroh "shows some tendency to social[] withdrawal and avoidance, but [she] can conduct herself appropriately with family, friends, neighbors, the general public and, in the past, with co-workers and supervisors." (Admin. Tr. 557, Doc. 9-10, at 58). With respect to her concentration, persistence, or pace, he found that Ms. Kroh "is anxious and has some problems with attention and focus, but can listen to

---

[6] For example, Dr. O'Connell noted in his review of Ms. Kroh's history that she had attempted to get psychotherapy and counseling, but her insurance wouldn't cover it. (Admin. Tr. 554, Doc. 9-10, at 55).

[7] A GAF score, given on a scale of 1 to 100, is a "rough estimate" of an individual's psychological, social, and occupational functioning, used to assess the need for treatment. *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998). "A GAF score is set within a particular range if either the symptom severity *or* the level of functioning falls within that range. The score is useful in planning treatment and predicting outcomes." *Schwartz v. Colvin*, No. 3:12-CV-01070, 2014 WL 257846, at *5 n.15 (M.D. Pa. Jan. 23, 2014) (citation omitted). "A GAF score of 21–30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas." *Schwartz*, 2014 WL 257846, at *5 n.15.

the radio, watch television, read the newspaper, and cook a light meal." (Admin. Tr. 557, Doc. 9-10, at 58).

Dr. O'Connell's narrative report was accompanied by a checkbox form in which he further addressed Ms. Kroh's limitations with respect to social functioning and concentration, persistence, or pace. (Admin. Tr. 550, Doc. 9-10, at 51). On this form, Dr. O'Connell indicated that Ms. Kroh had no limitations to her ability to understand, remember and carry out short, simple instructions, that she had slight limitations to her ability to understand and remember detailed instructions, and that she had moderate limitations to her ability to carry out detailed instructions, and make judgments on simple work-related decisions. (Admin. Tr. 550, Doc. 9-10, at 51). Dr. O'Connell further indicated that Ms. Kroh had no limitations to her ability to interact appropriately with the public, her supervisors, or her co-workers, but that she had marked limitations with respect to her ability to respond appropriately to work pressures in a usual work setting or to changes in a routine work setting. (Admin. Tr. 550, Doc. 9-10, at 51). When prompted to provide any "medical/clinical finding(s) [that] support this assessment" in a space below each set of checkboxes, Dr. O'Connell left a blank space. (Admin. Tr. 550, Doc. 9-10, at 51).

Ultimately, the ALJ afforded "little weight" to Dr. O'Connell's opinion, finding that "it is a self-reported snapshot and it is internally inconsistent." (Admin. Tr. 297, Doc. 9-4, at 66). The ALJ noted that Dr. O'Connell "gave moderate limitations regarding detailed instructions[,] yet he also gave mild limitations regarding simple instructions when one would expect marked limitations regarding detailed instructions." (Admin. Tr. 297, Doc. 9-4, at 66). The ALJ specifically noted that she gave "little weight" to the marked limitations found by Dr. O'Connell with respect to Ms. Kroh's ability to respond appropriately to work

pressures or to changes in her work setting because they were "not supported by his own examination or the balance of the record." (Admin. Tr. 297, Doc. 9-4, at 66)

Pursuant to 20 C.F.R. § 404.1527(c), the ALJ considered the medical opinion of Randon Welton, M.D., a psychiatrist who treated Ms. Kroh when admitted for a three-day stay at a psychiatric hospital. (Admin. Tr. 297, Doc. 9-4, at 66). Ms. Kroh was admitted to the Pennsylvania Psychiatric Institute for inpatient treatment on July 5, 2011, and she was discharged for further outpatient care on July 8, 2011. (Admin. Tr. 612–21, Doc. 9-10, at 113–22). The medical records documenting this hospital stay do not detail Ms. Kroh's status upon admission or during treatment there, but they include a discharge instruction sheet by Dr. Welton setting forth a working diagnosis of cyclothymic disorder with a possible diagnosis of type two bipolar disorder to be ruled out, and an additional diagnosis of social phobia. (Admin. Tr. 612, Doc. 9-10, at 113). Dr. Welton further identified Ms. Kroh's history of irritable bowel syndrome as a physical medical condition that may affect her mental disorder. (Admin. Tr. 612, Doc. 9-10, at 113). He identified unspecified "problems with medication" as an environmental or psychosocial problem that affects the care of her mental disorder.[8] (Admin. Tr. 612, Doc. 9-10, at 113). Dr. Welton assessed Ms. Kroh's overall function, assigning her a GAF score of 61–70.[9] (Admin. Tr. 612, Doc. 9-10, at 113). Dr. Welton's opinion did not include any narrative observations or findings, and the

---

[8] Ms. Kroh's medical records appear to document a long, ongoing effort by her medical providers to adjust her medications without ever obtaining a satisfactory drug regimen.

[9] "A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships." Schwartz, 2014 WL 257846, at *5 n.15.

medical records for this hospital stay include no treatment notes that might provide any further supporting details. It does appear, however, that her medications were adjusted during this period of inpatient treatment. (Admin. Tr. 618–21, Doc. 9-10, at 119–22). Ultimately, the ALJ afforded "great weight" to Dr. Welton's opinion that Ms. Kroh had a GAF score of 61–70 upon discharge, indicating that this assessment was supported by an unspecified report by Ms. Kroh to her primary care provider.[10] (Admin. Tr. 297, Doc. 9-4, at 66).

Pursuant to 20 C.F.R. § 404.1527(c), the ALJ considered the medical opinion of Aditya Joshi, M.D., a psychiatrist who treated Ms. Kroh when admitted for a second stay at the Pennsylvania Psychiatric Institute. (Admin. Tr. 297, Doc. 9-4, at 66). Ms. Kroh was admitted to the psychiatric hospital for inpatient treatment on August 10, 2011, due to "[i]ncreasing depressed mood with suicidal thoughts/plan to overdose on medication." (Admin. Tr. 623, Doc. 9-4, at 124). She was discharged nine days later on August 19, 2011. (Admin. Tr. 623–24, Doc. 9-4, at 124–25). Her treatment records indicate that Dr. Joshi diagnosed her as suffering from cyclothymic disorder, panic disorder without agoraphobia,

---

[10] The ALJ cited an exhibit containing her primary care provider's treatment records for the entire period of November 2010 through September 2011. Based on the administrative record before the ALJ, the only documented office visit by Ms. Kroh to her primary care provider in the entire calendar year was on August 31, 2011, which followed after a subsequent nine-day inpatient stay at the same psychiatric hospital in early August. (Admin. Tr. 583–86, Doc. 9-10, at 84–87). At that office visit, Ms. Kroh stated that she had been admitted to the hospital for depression, anxiety, and suicidal ideation, that they changed her meds around, and that she was "[f]eeling better now." (Admin. Tr. 584, Doc. 9-10, at 85). She also noted that she had been newly diagnosed with hypothyroidism and prescribed Synthroid, which also apparently transpired during her three-day hospital stay in July 2011. (Admin. Tr. 584, Doc. 9-10, at 85; *see also* Admin. Tr. 612–21, Doc. 9-10, at 113–22). At this office visit, her primary care physician concluded that she was "[n]ot clinically depressed, appear[s] stable," and that she should continue her current psychiatric drug regimen. (Admin. Tr. 586, Doc. 9-10, at 87).

and social phobia. (Admin. Tr. 624, Doc. 9-4, at 125; *see also* Admin. Tr. 627, Doc. 9-4, at 128 (initial diagnosis of cyclothymic disorder and panic disorder upon admission)). Dr. Joshi further identified hypothyroidism and irritable bowel syndrome as physical medical conditions that may affect Ms. Kroh's mental disorder. (Admin. Tr. 627, Doc. 9-4, at 128). Dr. Joshi identified "chronic mental health illness" as an environmental or psychosocial problem that affects the care of her mental disorder. (Admin. Tr. 624, Doc. 9-4, at 125; Admin. Tr. 627, Doc. 9-4, at 128). Dr. Joshi assessed Ms. Kroh's overall function upon admission and discharge, assigning her a GAF score of 20 upon admission,[11] and 55 upon discharge after nine days of treatment.[12] (Admin. Tr. 624, Doc. 9-4, at 125). Dr. Joshi's opinion did not include any narrative observations or findings, and the medical records for this hospital stay include no treatment notes that might provide any further supporting details. It does appear, however, that her medications were adjusted once again. (Admin. Tr. 623, Doc. 9-10, at 124). Ultimately, the ALJ afforded "little weight" to Dr. Joshi's opinion that Ms. Kroh had a GAF score of 20 upon admission, explaining that the basis for her admission "was not a suicide attempt, but only a wish to be dead with a nebulous plan to overdose on medication and a depressed mood. The GAF score is too low for functionality . . . ." (Admin. Tr. 297, Doc. 9-4, at 66). At the same time, the ALJ afforded "great weight" to Dr. Joshi's opinion, rendered nine days later, that Ms. Kroh had a GAF

---

[11] "A GAF score of 11 to 20 represents some danger of hurting self or others or occasionally fails to maintain minimal personal hygiene or gross impairment in communication." *Schwartz*, 2014 WL 257846, at *5 n.15.

[12] "A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning." *Schwartz*, 2014 WL 257846, at *5 n.15.

score of 55 upon discharge, explaining that, unlike the lower admission GAF score, Dr. Joshi's discharge GAF score was supported by unspecified objective medical evidence of record.[13] (Admin. Tr. 297, Doc. 9-4, at 66).

Pursuant to 20 C.F.R. § 404.1527(c), the ALJ considered the medical opinion of Jeffrey A. Okamoto, M.D., a psychiatrist who treated Ms. Kroh as an outpatient in late 2009.[14] (Admin. Tr. 297, Doc. 9-4, at 66). On September 30, 2009, presented for a psychiatric evaluation, complaining of depression and anxiety. (Admin. Tr. 498, Doc. 9-9, at 41). Dr. Okamoto's written evaluation provided a review of Ms. Kroh's medical, personal, and vocational history, apparently self-reported by the claimant. (Admin. Tr. 498–99, Doc. 9-9, at 41–42). Dr. Okamoto documented his personal observations on Ms. Kroh's mental status:

> The patient was casually dressed and cooperative during the interview. Speech was logical and relevant. Mood and affect were depressed. Thought content was nonpsychotic. The patient denied any suicidal or homicidal ideation. The patient was oriented [to place, time, and identity] with good recent and remote memory, [ability to calculate] serial sevens, general information, judgment, and abstraction. She had some insight into her depression.

(Admin. Tr. 499, Doc. 9-9, at 42).

Dr. Okamoto then provided an assessment of Ms. Kroh's psychiatric treatment, relying in large part on self-reported information by Ms. Kroh:

---

[13] The ALJ cited an exhibit containing the Pennsylvania Psychiatric Institute's treatment records for the nine-day hospital stay, which contained no narrative observations or findings other than Dr. Joshi's conclusory diagnoses (which include both GAF scores), comments by group therapy staff on Ms. Kroh's participation in group therapy, and inpatient and discharge treatment plans. (Admin. Tr. 623–27, Doc. 9-4, at 124–28).

[14] In his psychiatric evaluation, Dr. Okamoto indicated that he had previously treated Ms. Kroh for an earlier episode of depression over a three-month period more than a decade earlier — between July and October 1996. (Admin. Tr. 498, Doc. 9-9, at 41).

This patient reports being depressed more the last four to five months. If 10 is no depression at all and 1 is suicidal, the patient's about a 6. Currently Wellbutrin SR 200 mg [twice per day], which she's been on for two years, and Celexa 40 mg [every morning], which she's been on for two months, are not helping her that much. However, she has been drinking more alcohol over the last five to six months. She can't point to any specific psychosocial stressors other than finances being tight.

(Admin. Tr. 499, Doc. 9-9, at 42).

Based on his examination, Dr. Okamoto provided a clinical diagnosis of Ms. Kroh as suffering from: recurrent major depressive disorder of moderate severity; and generalized anxiety disorder. (Admin. Tr. 500, Doc. 9-9, at 43). He further diagnosed Ms. Kroh with obsessive-compulsive personality traits. (Admin. Tr. 500, Doc. 9-9, at 43). Dr. Okamoto identified Ms. Kroh's history of irritable bowel syndrome and migraine headaches as physical medical conditions that may affect her mental disorder. (Admin. Tr. 500, Doc. 9-9, at 43). He identified Ms. Kroh's tight finances as an environmental or psychosocial problem that affects the care of her mental disorder. (Admin. Tr. 500, Doc. 9-9, at 43). Dr. Okamoto assessed Ms. Kroh's overall function, assigning her a GAF score of 50.[15] (Admin. Tr. 500, Doc. 9-9, at 43).

Dr. Okamoto noted that Ms. Kroh had expressed no interest in outpatient psychotherapy, but he modified her medication regimen. (Admin. Tr. 500, Doc. 9-9, at 43). Dr. Okamoto scheduled her for a follow-up appointment with him in eight weeks. (Admin. Tr. 500, Doc. 9-9, at 43). Ms. Kroh subsequently rescheduled that appointment due to insurance issues, then failed to appear for her rescheduled appointment. (Admin. Tr. 497, Doc. 9-9, at 40). Dr. Okamoto had no further contact with Ms. Kroh after her September

---

[15] "A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning." *Schwartz*, 2014 WL 257846, at *5 n.15.

2009 psychiatric evaluation. (Admin. Tr. 500, Doc. 9-9, at 43).

Ultimately, the ALJ afforded "some weight" to Dr. Okamoto's opinion that Ms. Kroh had a GAF score of 50, explaining that Dr. Okamoto's opinion was based on a single office visit and relied on "self-reported symptoms and problems and her financial stressors." (Admin. Tr. 297, Doc. 9-4, at 66).

Pursuant to 20 C.F.R. § 404.1527(c), the ALJ considered the medical opinion of Andrew Newton, M.D., a psychiatrist who began treating Ms. Kroh as an outpatient after her two hospital stays in the summer of 2011. (Admin. Tr. 297, Doc. 9-4, at 66). Ms. Kroh first presented to Dr. Newton on September 9, 2011, complaining of depression, difficulty sleeping, anxiety, and panic attacks. (Admin. Tr. 609–10, Doc. 9-10, at 110–11). She denied any current suicidal ideation. (Admin. Tr. 609, Doc. 9-10, at 110). Dr. Newton recorded Ms. Kroh's self-reported history in his treatment notes. (Admin. Tr. 610, Doc. 9-10, at 111). His treatment notes also include several findings based upon his observation of Ms. Kroh. She presented with normal appearance, normal speech, and euthymic mood, but exhibited psychomotor agitation. (Admin. Tr. 609, Doc. 9-10, at 110). Her affect was mood-congruent, her thought process was goal directed, her sensorium was alert, and she appeared oriented to place, person, time, and situation. (Admin. Tr. 609, Doc. 9-10, at 110). Ms. Kroh did not exhibit any suicidal or homicidal thought content, nor any hallucinations, delusions, or obsessions. (Admin. Tr. 609, Doc. 9-10, at 110). Her cognition, insight, judgment, attention and concentration appeared to be impaired. (Admin. Tr. 609, Doc. 9-10, at 110). Dr. Newton's treatment notes indicate a working diagnosis of panic disorder with agoraphobia, with possible diagnoses of type two bipolar disorder and cyclothymic disorder to be ruled out, and a possible residual diagnosis of a psychotic disorder not

otherwise specified. (Admin. Tr. 609, Doc. 9-10, at 110). Dr. Newton assessed Ms. Kroh's overall function, assigning her a GAF score of 50. (Admin. Tr. 609, Doc. 9-10, at 110). He adjusted Ms. Kroh's medication regimen for what was at least the third time in a three month period. (Admin. Tr. 609, Doc. 9-10, at 110; Admin. Tr. 611, Doc. 9-10, at 112). Dr. Newton advised Ms. Kroh to return for further treatment in a month. (Admin. Tr. 609, Doc. 9-10, at 110).

Ms. Kroh presented for a second office visit with Dr. Newton on October 7, 2011, complaining that she was still having difficulty sleeping due to her mind racing rapidly. (Admin. Tr. 608, Doc. 9-10, at 109). Dr. Newton observed that Ms. Kroh presented with normal appearance, normal behavior (no abnormal psychomotor agitation), and euthymic mood, but that her speech was delayed and her affect restricted. (Admin. Tr. 608, Doc. 9-10, at 109). He observed that Ms. Kroh's thought process was goal directed, her sensorium was alert, and she was oriented to place, person, time, and situation. (Admin. Tr. 608, Doc. 9-10, at 109). She exhibited no signs of suicidal or homicidal ideation, hallucinations, delusions, or obsessions. (Admin. Tr. 608, Doc. 9-10, at 109). Dr. Newton found her cognition to be impaired, her insight and judgment to be "fair," and her attention and concentration to be normal. (Admin. Tr. 608, Doc. 9-10, at 109). His treatment notes indicate that his primary working diagnosis continued to be panic disorder with agoraphobia, with secondary diagnoses of type two bipolar disorder and cyclothymic disorder. (Admin. Tr. 608, Doc. 9-10, at 109). Dr. Newton assessed Ms. Kroh's overall function and assigned her a GAF score of 50. (Admin. Tr. 608, Doc. 9-10, at 109). He once again adjusted Ms. Kroh's medication regimen. (Admin. Tr. 608, Doc. 9-10, at 109; Admin. Tr. 611, Doc. 9-10, at 112). Dr. Newton advised Ms. Kroh to return for further treatment in

a month. (Admin. Tr. 608, Doc. 9-10, at 109).

The record before the ALJ indicated that Ms. Kroh presented to Dr. Newton for a third time on January 3, 2012, complaining that, despite taking her prescribed medications, her depression had been getting worse.[16] (Admin. Tr. 632, Doc. 9-10, at 133). She complained that she had no energy, felt physically exhausted and anhedonic (unable to experience pleasure), and she had become socially withdrawn. (Admin. Tr. 632, Doc. 9-10, at 133). Dr. Newton observed that she appeared disheveled and exhibited psychomotor retardation, her speech was soft and delayed, her mood dysthymic, and her affect was restricted and blunt. (Admin. Tr. 632, Doc. 9-10, at 133). Ms. Kroh exhibited no suicidal or homicidal ideation, hallucinations, delusions, or obsessions. (Admin. Tr. 632, Doc. 9-10, at 133). Her thought process was goal directed, her sensorium alert, and she was oriented to place, person, time, and situation. (Admin. Tr. 632, Doc. 9-10, at 133). Dr. Newton made no observation with respect to Ms. Kroh's cognition, but he found her insight and judgment to be "fair," and her attention and concentration normal. (Admin. Tr. 632, Doc. 9-10, at 133). Dr. Newton's treatment notes indicate a shift in diagnosis to major depressive disorder, recurrent and severe, with a secondary diagnosis of generalized anxiety disorder. (Admin. Tr. 632, Doc. 9-10, at 133). Dr. Newton assessed Ms. Kroh's overall function and assigned her a GAF score of 45. (Admin. Tr. 632, Doc. 9-10, at 133). Dr. Newton adjusted Ms. Kroh's medication regimen and indicated in his treatment notes that, if her condition had not improved within two weeks, she would be admitted to a psychiatric hospital for inpatient treatment. (Admin. Tr. 632, Doc. 9-10, at 133).

---

[16] Additional evidence proffered to the Appeals Council after the ALJ's decision included treatment notes documenting additional monthly office visits in the interim.

Ultimately, the ALJ afforded "little weight" to Dr. Newton's September 2011 opinion that Ms. Kroh had a GAF score of 50, explaining that it was based on "only one examination which is a very short treatment relationship." (Admin. Tr. 297, Doc. 9-4, at 66). She further noted that, for unspecified reasons, Dr. Newton's "decent mental status examination" did not support the low GAF score assigned, and that it came only shortly after her release from a psychiatric hospital and before any treatment had begun. (Admin. Tr. 297, Doc. 9-4, at 66). The ALJ also afforded "little weight" to Dr. Newton's January 2012 opinion that Ms. Kroh had a GAF score of 45, explaining that "if her score and functioning was really at 45, he would recommend admitting her then and there, not wait two weeks . . . ." (Admin. Tr. 298, Doc. 9-4, at 67). The ALJ did not address Dr. Newton's October 2011 opinion that Ms. Kroh had a GAF score of 50, after one month of treatment with Dr. Newton.

Pursuant to 20 C.F.R. § 404.1527(c), the ALJ considered the medical opinion of James Klebe, a licensed psychologist. (Admin. Tr. 297, Doc. 9-4, at 66). Dr. Klebe provided psychotherapy treatment to Ms. Kroh during her August 2011 hospital stay, and on an outpatient basis for a series of thirteen psychotherapy sessions between October 2011 and January 2012.[17] (Admin. Tr. 629, Doc. 9-10, at 130; *see also* Admin. Tr. 634–46, Doc .9-10, at 135–47 (treatment notes)). On January 3, 2012, Dr. Klebe wrote a letter on Ms. Kroh's behalf, summarizing her background and her psychiatric treatment history, and providing his opinion that:

---

[17] It appears from the record that Dr. Klebe continued to treat Ms. Kroh after the ALJ's decision, as did Dr. Newton.

> Her depressive symptoms mostly likely will remain difficult to treat and her prognosis is guarded at this time. With regard to employability, I do not feel she is capable of gainful employment. At this time, she does not have the strength necessary to comply to the requirements of the least demanding job. Her ability to focus, maintain concentration, adapt to new environments, and interact socially with others is significantly impaired.

(Admin. Tr. 629–30, Doc. 9-10, at 130–31).

The ALJ afforded "little weight" to Dr. Klebe's opinion, without stating any explicit reason for discounting it.[18] (Admin. Tr. 297, Doc. 9-4, at 66).

Pursuant to 20 C.F.R. § 404.1513(d) and Social Security Ruling 06-03p, 2006 WL 2329939, the ALJ considered a third-party function report submitted by Ms. Kroh's mother, in which her mother described Ms. Kroh's activities of daily living, her social functioning, and the impact of her alleged impairments on her vocational abilities, and she provided her opinion that Ms. Kroh was incapable of working due to depression and anxiety. (Admin. Tr. 298, Doc. 9-4, at 67; *see also* Admin. Tr. 422–29, Doc. 9-8, at 24–31). The ALJ afforded "little weight" to the mother's function report and her lay opinion that Ms. Kroh could not work, noting that the mother is not an acceptable medical source and she is motivated to help the claimant obtain disability benefits. (Admin. Tr. 298, Doc. 9-4, at 67).

At step four of the five-step process, the ALJ determined that Ms. Kroh  was capable of performing past relevant work as a laborer in the water bottling business. (Admin. Tr. 298, Doc. 9-4, at 67). Based on Ms. Kroh's RFC, her past relevant work, and the testimony of a vocational expert, the ALJ determined that Ms. Kroh was capable of performing her

---

[18] In its entirety, the ALJ's treatment of this opinion stated: "The undersigned gives little weight to the January 2012 evaluation by Mr. Klebe for Social Security purposes which says they met on thirteen occasions and she indicated she was depressed, but she was not actively suicidal (Exhibit 16F)." (Admin. Tr. 297, Doc. 9-4, at 66). No further analysis or rationale was provided.

past relevant work as a laborer in the water bottling business, as actually and generally performed. (Admin. Tr. 298, Doc. 9-4, at 67).

As a result of her findings at step four, the ALJ concluded that Ms. Kroh was not disabled at any time between her alleged onset date of February 28, 2009, and the date of the ALJ's decision, January 30, 2012. (Admin. Tr. 299, Doc. 9-4, at 68).

## IV. ANALYSIS

Ms. Kroh asserts that the ALJ's decision is not supported by substantial evidence because: (1) the Appeals Council abused its discretion in refusing to consider new and material evidence that would have established additional episodes of decompensation; (2) the ALJ improperly relied upon a non-examining state agency medical consultant's RFC assessment that was not based on Ms. Kroh's full medical record at the time of the ALJ's decision, and that the ALJ improperly dismissed contrary medical opinions without rationale; (3) the ALJ improperly substituted her own judgment on medical issues for that of Ms. Kroh's treating psychiatrist, Dr. Newton, in rejecting his opinions; (4) the ALJ improperly rejected certain limitations stated in the medical opinions of its own experts, Dr. O'Connell and Dr. Sadar, omitting them from a hypothetical posed to a vocational expert at the claimant's hearing; and (5) the ALJ improperly credited the non-examining medical opinion of Dr. Sadar over those provided by treating and examining physicians Dr. Newton, Dr. Okamoto, and Dr. O'Connell, and she failed to address Dr. Klebe's opinion at all.

### A. NEW EVIDENCE SUBMITTED TO THE APPEALS COUNCIL

To facilitate the "orderly and sympathetic administration" of the Social Security disability insurance benefits program, an "unusually protective four-step process for the review and adjudication of disputed claims" has been established by Congress and the

Commissioner. *Heckler v. Day*, 467 U.S. 104, 106 (1984). "First, a state agency determines whether the claimant has a disability and the date the disability began or ceased." *Heckler*, 467 U.S. at 106 (citing 42 U.S.C. § 421(a), and 20 C.F.R. § 404.1503). "Second, if the claimant is dissatisfied with that determination, he may request reconsideration of the determination" by the state agency, which in some cases includes a full evidentiary hearing. *Heckler*, 467 U.S. at 106–07 (citing 20 C.F.R. §§ 404.907–404.921). "Third, if the claimant receives an adverse reconsideration determination, he is entitled by statute to an evidentiary hearing and to a de novo review by an Administrative Law Judge . . . ." *Heckler*, 467 U.S. at 107 (citing 42 U.S.C. § 405(b), and 20 C.F.R. §§ 404.929–404.961). "Finally, if the claimant is dissatisfied with the decision of the ALJ, he may take an appeal to the Appeals Council . . . ." *Heckler*, 467 U.S. at 107 (citing 20 C.F.R. §§ 404.967–404.983). "These four steps exhaust the claimant's administrative remedies. Thereafter, he may seek judicial review in federal district court." *Heckler*, 467 U.S. at 107 (citing 42 U.S.C. § 405(g)).

The Third Circuit has discussed the standard that governs the Appeals Council's review of purportedly new and material evidence that was not present in the record considered by the ALJ:

> The regulations permit the claimant to submit to the Appeals Council "new and material" evidence that relates to the period on or before the date of the ALJ's hearing decision. The Appeals Council then must "evaluate the entire record including the new and material evidence submitted." However, the submission of the new and material evidence does not require the Appeals Council to grant review. On the contrary, the regulations provide that the Appeals Council will grant review only if it finds that the ALJ's decision "is contrary to the weight of the evidence currently of record."

> *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001) (quoting 20 C.F.R. § 404.970(b)) (citations omitted); *see also Heckler*, 467 U.S. at 107 n.5.

Following the ALJ's decision on January 30, 2012, Ms. Kroh submitted additional

medical records in support of her benefits claim. On March 8, 2012, Ms. Kroh submitted additional treatment notes by Dr. Klebe, covering eleven psychotherapy sessions that occurred between January 10, 2012, and February 20, 2012. (Admin. Tr. 648–60, Doc. 9-11, at 3–15). On March 9, 2012, Ms. Kroh submitted additional treatment notes by Dr. Newton, covering four office visits that occurred between November 7, 2011, and February 27, 2012.[19] (Admin. Tr. 661–67, Doc. 9-11, at 16–22). On June 28, 2012, Ms. Kroh submitted additional medical records documenting her admission to a psychiatric hospital on March 20, 2012, for inpatient treatment, and her discharge six days later on March 26, 2012. (Admin. Tr. 219–32, Doc. 9-3, at 96–109). On October 1, 2012, Ms. Kroh submitted additional medical records documenting her admission to a hospital on May 22, 2012, for psychiatric treatment, including electroconvulsive therapy, her discharge three days later on May 25, 2012, and a series of clinic visits for further outpatient electroconvulsive therapy. (Admin. Tr. 125–218, Doc. 9-3, at 2–95). On November 12, 2012, Ms. Kroh submitted additional medical records pertaining to a ten-day hospital stay for treatment of various physical injuries she suffered in a one-car automobile accident on June 23, 2012, and several office visits with her primary care provider between February and October 2012. (Admin. Tr. 233–84, Doc. 9-4, at 2–53). On February 12, 2013, Ms. Kroh submitted additional medical records reflecting treatment of the physical injuries she suffered as a result of her automobile accident. (Admin. Tr. 9–124, Doc. 9-2, at 10–125).

On April 10, 2013, the Appeals Council denied her request for review of the ALJ's decision. (Admin. Tr. 1–4, Doc. 9-2, at 2–5). In denying review, the Appeals Council found

---

[19] The submission also included two copies of Dr. Newton's January 3, 2012, treatment notes, which were already in the record.

that these additional medical records did not "provide a basis for changing the [ALJ]'s decision" because they were not "contrary to the weight of evidence of record." (Admin. Tr. 1–2, Doc. 9-2, at 2–3). In particular, the Appeals Council noted that the bulk of the records submitted for consideration by the Appeals Council concerned events that occurred after the date of the ALJ's decision on January 30, 2012. (Admin. Tr. 2, Doc. 9-2, at 3).

Ms. Kroh submitted a substantial body of medical records for consideration by the Appeals Council that was not placed before the ALJ. She now challenges this determination by the Appeals Council as an abuse of discretion. In particular, she contends that these subsequently submitted medical records document additional episodes of decompensation sufficient to meet or medically equal the criteria of listing 12.04, which would have, in turn, required the ALJ to find Ms. Kroh disabled at step three of the five-step sequential evaluation process. *See generally* 20 C.F.R. § 404.1520(a)(4) (five-step sequential evaluation process); 20 C.F.R. § 404.1520a (special technique for the evaluation of mental impairments); 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04 (listed impairment criteria for affective disorders).

Unlike the administrative appeals process, which is governed by the agency regulations discussed above, the standards for judicial review are governed by the Social Security Act. *See* 42 U.S.C. § 405(g); *see also Matthews*, 239 F.3d at 592. Generally, Social Security appeals are considered and decided by this Court pursuant to sentence four of § 405(g), which provides that "[t]he court shall have the power to enter, *upon the pleadings and transcript of the record*, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g) (sentence four) (emphasis added); *see also Matthews*, 239 F.3d at 592. The

Act further provides that "[t]he findings of the Commissioner of Social Security as to any fact, *if supported by substantial evidence*, shall be conclusive." 42 U.S.C. § 405(g) (sentence five) (emphasis added); *see also Matthews,* 239 F.3d at 592. "For the purposes of judicial review, the 'record' is 'the evidence upon which the findings and decision complained of are based.' That is the information that was before the ALJ, the final administrative decisionmaker when the Appeals Council denies review." *Matthews,* 239 F.3d at 594 (quoting 42 U.S.C. § 405(g) (sentence three)).

But if the claimant proffers evidence in this Court that was not presented to the ALJ, disposition of the case may instead be governed by sentence six of § 405(g), which provides that:

> The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and *it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding* . . . .

> 28 U.S.C. § 405(g) (sentence six) (emphasis added); *see also Matthews,* 239 F.3d at 592.

Thus, "when the Appeals Council has denied review the district court may affirm, modify, or reverse the Commissioner's decision, without or without a remand *based on the record that was made before the ALJ* (Sentence Four review)," but "when the claimant seeks to rely on evidence that was not before the ALJ, the district court may remand to the Commissioner *but only if the evidence is new and material and if there was good cause why it was not previously presented to the ALJ* (Sentence Six review)." *Matthews,* 239 F.3d at 593 (emphasis added). "[A]lthough evidence considered by the Appeals Council is part of the administrative record on appeal, it cannot be considered by the District Court in making its

substantial evidence review once the Appeals Council has denied review." *Matthews,* 239 F.3d at 593.

Therefore, the Court is here presented with a threshold question regarding the additional evidence submitted by Ms. Kroh to the Appeals Council after the ALJ issued her decision on January 30, 2012. But the question is not whether the Appeals Council abused its discretion in denying review based on this purportedly new and material evidence. *See Matthews,* 239 F.3d at 594 ("No statutory authority (the source of the district court's review) authorizes the court to review the Appeals Council decision to deny review."). Rather, the question is whether the statutory criteria for a sentence six remand is met — that is, whether the evidence is (1) new and (2) material and if there was (3) good cause why it was not presented to the ALJ. *See* 28 U.S.C. § 405(g) (sentence six); *Matthews,* 239 F.3d at 592–93.

First, the evidence must truly be "new" and "not merely cumulative of what is already in the record." *Szubak v. Sec'y of Health & Hum. Servs.,* 745 F.2d 831, 833 (3d Cir. 1984) (per curiam). Certain pages of the evidence submitted after the ALJ's decision are duplicative of or cumulative to evidence already in the record before the ALJ, and therefore cannot be considered "new." (Admin. Tr. 662, Doc. 9-11, at 17; Admin. Tr. 665, Doc. 9-11, at 20; Admin. Tr. 668–70, Doc. 9-11, at 23–25; Admin. Tr. 673–75, Doc. 9-11, at 28–30; Admin. Tr. 679, Doc. 9-11, at 34).

Second, the evidence must be "material" — that is, it must be "relevant and probative." *Szubak,* 745 F.2d at 833. "[T]he new evidence [must] relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Szubak,* 745 F.2d at 833. The vast majority of the evidence submitted after the ALJ's

decision related to the time period *after* the ALJ's decision on January 30, 2012, including evidence of subsequent deterioration of her mental status, including dwindling GAF scores, two periods of psychiatric hospitalization for several days each in March and May 2012, and a course of outpatient electroconvulsive therapy, as well as possible later-acquired physical disabilities as a result an automobile accident in June 2012. (Admin Tr. 9–124, Doc. 9-2, at 10–125; Admin. Tr. 125–232, Doc. 9-3, at 2–109; Admin. Tr. 233–84, Doc. 9-4, at 2–53; Admin. Tr. 656–59, Doc. 9-11, at 11–14; Admin. Tr. 667, Doc. 9-11, at 22). Moreover, "there must be a reasonable possibility that the new evidence would have changed the outcome of the [ALJ]'s determination." *Szubak*, 745 F.2d at 833. Several of the remaining documents, such as routine lab results and radiology reports concerning physical maladies unrelated to Ms. Kroh's mental disorder, are simply devoid of any potential probative value. (Admin. Tr. 671–72, Doc. 9-11, at 26–27; Admin. Tr. 676–77, Doc. 9-11, at 31–32).

"Finally, the claimant must demonstrate good cause for not having incorporated the new evidence into the administrative record." *Szubak*, 745 F.2d at 833. It is the claimant's burden to provide "some justification for the failure to acquire and present such evidence to the [ALJ]." *Szubak*, 745 F.2d at 833; *see also Matthews*, 239 F.3d at 595. The remainder of the evidence submitted after the ALJ's decision in this case are additional treatment notes by Dr. Newton dated November 7, 2011, December 6, 2011, and January 30, 2012, and by Dr. Klebe dated January 10, 2012, January 12, 2012, January 16, 2012, January 19, 2012, January 23, 2012, January 27, 2012, and January 30, 2012. (Admin. Tr. 648–52, Doc. 9-11, at 3–7; Admin. Tr. 654–55, Doc. 9-11, at 9–10; Admin. Tr. 663–64, Doc. 9-11, at 18–19; Admin. Tr. 666, Doc. 9-11, at 21). Ms. Kroh has failed to offer any justification whatsoever

for her failure to acquire and present these documents to the ALJ.

Accordingly, Ms. Kroh has failed to satisfy the statutory requirements for a sentence-six remand, and the Court is precluded from further considering the additional evidence submitted to the Appeals Council by Ms. Kroh after the ALJ's decision had been issued on January 30, 2012.[20]

## B. Hypothetical Question Posed to the Vocational Expert

Ms. Kroh contends that the ALJ improperly omitted certain unspecified limitations from the hypothetical question posed to a vocational expert at Ms. Kroh's January 5, 2012, hearing. Ms. Kroh has failed to articulate these limitations, making this particular ground for appeal impossible to evaluate. But the Court notes that the hypothetical posed to the vocational expert appears to mirror, without any substantial variation whatsoever, the ALJ's ultimate RFC determination. (*Compare* Admin. Tr. 293, Doc. 9-4, at 62, *with* Admin. Tr. 348, Doc. 9-4, at 117). The Court finds no apparent error with respect to the hypothetical posed to the vocational expert in this case.

## C. The ALJ's Evaluation of Medical Opinion Evidence

The remaining issues raised concern the evaluation of various medical opinions. Before delving into the ALJ's treatment of each of the particular medical opinions of record, a brief overview of the medical opinions and the weight afforded to each by the ALJ is in order, as is a general discussion of the use of GAF scores in disability determinations.

---

[20] That is not to say, however, that this additional evidence would not be admissible in further proceedings on remand pursuant to a sentence-four disposition. Under Third Circuit precedent, if a case is remanded for further proceedings, the Court is required to direct the Commissioner and ALJ to reopen and fully develop the record before rendering a new ruling. *See Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798, 800–01 (3d Cir. 2010).

In September 2009, Ms. Kroh met one time with Dr. Okamoto, a psychiatrist who had treated her for a period of depression thirteen years earlier. Dr. Okamoto assessed Ms. Kroh's overall function and assigned her a GAF score of 50, indicating either serious symptoms or a serious impairment in social or occupational functioning. *See Schwartz*, 2014 WL 257846, at *5 n.15. The ALJ considered the GAF score assigned by Dr. Okamoto as a medical opinion and gave it "some weight."

In November 2010, Dr. O'Connell, a psychologist and consultative examiner for the state bureau of disability determination, examined Ms. Kroh and provided a written assessment of her mental status and functional impairments. Dr. O'Connell assessed Ms. Kroh's overall function and assigned her a GAF score of 30, indicating serious impairment in communication or judgment or inability to function in almost all areas.[21] *See Schwartz*, 2014 WL 257846, at *5 n.15. He also assessed her limitations in some of the functional areas identified by the Social Security disability regulations, finding slight limitations in Ms. Kroh's ability to understand and remember detailed instructions, moderate limitations in her ability to carry out detailed instructions and to make judgments on simple work-related decisions, and marked limitations with respect to her ability to respond appropriately to work pressures in a usual work setting or to changes in a routine work setting. The ALJ considered Dr. O'Connell's medical opinion and gave it "little weight."

In December 2010, Dr. Sadar, a non-examining state agency medical consultant, prepared a written assessment of Ms. Kroh's mental status and functional impairments,

---

[21] Another possible basis for a 30 GAF score is the presence of behavior influenced by delusions or hallucinations. *See Schwartz*, 2014 WL 257846, at *5 n.15. But Dr. O'Connell's report does not document any delusions or hallucinations, nor does any other medical evidence of record.

based upon his review of her medical records. Dr. Sadar found mild limitations in Ms. Kroh's activities of daily living and her social functioning, moderate limitations in her concentration, persistence, or pace, and no episodes of decompensation. He found that she was capable of remembering simple one- and two-step instructions, performing one- and two-step tasks, and making simple decisions. He specifically addressed Dr. O'Connell's finding of marked limitations to Ms. Kroh's social functioning, rejecting it on the ground that it was not supported by Dr. O'Connell's narrative report. The ALJ considered Dr. Sadar's medical opinion and gave it "great weight."

In July 2011, Dr. Welton treated Ms. Kroh during her three-day psychiatric hospital admission. Upon discharge, Dr. Welton assessed Ms. Kroh's overall function and assigned her a GAF score of 61–70, indicating some mild symptoms or some difficulty in social or occupational functioning, but generally functioning pretty well and with some meaningful interpersonal relationships. *See Schwartz*, 2014 WL 257846, at *5 n.15. Dr. Welton's opinion regarding Ms. Kroh's GAF score was not accompanied by any narrative observations, nor any other explanation of his rating. The ALJ considered the GAF score of 61–70 assigned by Dr. Welton as a medical opinion and gave it "great weight."

In August 2011, Dr. Joshi treated Ms. Kroh during her nine-day psychiatric hospital admission. Upon admission, Dr. Joshi assessed Ms. Kroh's overall function and assigned her a GAF score of 20, indicating some danger of hurting herself, a failure to maintain minimal personal hygiene, or gross impairment in communication. *See Schwartz*, 2014 WL 257846, at *5 n.15. Upon discharge, following nine days of inpatient treatment, Dr. Joshi assessed Ms. Kroh's overall function and assigned her a GAF score of 55, indicating moderate symptoms or moderate difficulty in social or occupational functioning. *See*

*Schwartz*, 2014 WL 257846, at *5 n.15. Dr. Joshi's opinions regarding Ms. Kroh's GAF scores were not accompanied by any narrative observations, or any other explanation of his rating. The ALJ considered the GAF scores assigned by Dr. Joshi as medical opinions, giving the admission GAF score of 20 "little weight," and the discharge GAF score of 55 "great weight."

In August 2011, psychologist Dr. Klebe first met with Ms. Kroh as her psychotherapist during an inpatient hospital stay. Beginning in October 2011, Dr. Klebe met with Ms. Kroh three times a week for outpatient psychotherapy sessions. On January 3, 2012, Dr. Klebe wrote a letter on Ms. Kroh's behalf, providing his opinion that her prognosis was guarded, she was incapable of gainful employment, she lacked the strength necessary to perform even the least demanding job, and her abilities to focus, maintain concentration, adapt to new environments, and interact socially with others were significantly impaired. The ALJ considered Dr. Klebe's medical opinion and gave it "little weight."

Beginning in September 2011, psychiatrist Dr. Newton began treating Ms. Kroh, meeting with her on a monthly basis and managing her psychotropic medications. In his treatment notes for each office visit, Dr. Newton assessed Ms. Kroh's overall function assigned her a GAF score. On September 9, 2011, Dr. Newton assigned Ms. Kroh a GAF score of 50, indicating serious symptoms or serious impairment in social or occupational functioning. *See Schwartz*, 2014 WL 257846, at *5 n.15. On October 7, 2011, Dr. Newton again assigned Ms. Kroh a GAF score of 50. On January 3, 2012, Dr. Newton assigned Ms. Kroh a GAF score of 45, adjusted her medication, and noted that she would be admitted to a psychiatric hospital for inpatient treatment if her mental status had not improved within

two weeks. The ALJ considered the GAF scores assigned by Dr. Newton in September and January as medical opinions, giving both of them "little weight." The ALJ failed to address the October GAF score.

As this overview makes clear, much the medical opinion evidence considered by the ALJ consisted of raw GAF scores, without any narrative explanations, recorded by psychiatrists in the course of treating Ms. Kroh's mental disorder. These scores can be fairly ambiguous with respect each treating psychiatrist's actual opinion regarding the patient's functional capacity. "GAF scores are intended to be used to make treatment decisions, . . . not as a measure of the extent of an individual's disability." *Warner v. Astrue*, 880 F. Supp. 2d 935, 943 (N.D. Ind. 2012) (quoting another source) (alterations in original). "[A] GAF score actually reflects two factors: the severity of a patient's symptoms and his level of functioning. . . . Where the symptom severity and impairment severity are not at the same level, the clinician is directed to use the score which reflects the *worse* of the two." *Pounds v. Astrue*, 772 F. Supp. 2d 713, 725 (W.D. Pa. 2011) (emphasis added); *see also Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("Because the final GAF rating always reflects the worse of the two, the score does not reflect the clinician's opinion of functional capacity.") (citation and internal quotation marks omitted). The Social Security Administration itself has long recognized that GAF scores do not have "a direct correlation to the severity requirements" of the Social Security mental disorder listings. *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764–65 (Aug. 21, 2000) (codified at 20 C.F.R. pts. 404 & 416). Thus, GAF scores are not dispositive, but merely "medical evidence that informs the Commissioner's judgment of whether an individual is disabled." *See Rios v. Comm'r of Soc. Sec.*, 444 Fed. App'x 532, 535

(3d Cir. 2011); *see also Davis v. Astrue*, 830 F. Supp. 2d 31, 46 (W.D. Pa. 2011).

Indeed, subsequent to the ALJ's decision in this case, the GAF scale appears to have fallen somewhat into disfavor. "Due to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed, the [American Psychiatric Association] abandoned the GAF score in its recently published fifth edition of the Diagnostic and Statistical Manual of Mental Disorders." *Solock v. Astrue*, No. 1:12-CV-1118, 2014 WL 2738632, at *6 (M.D. Pa. June 17, 2014) (alterations omitted). The Social Security Administration has since issued an administrative message that "provides guidance to all State and Federal adjudicators (including administrative law judges) on how to consider [GAF] ratings when assessing disability claims involving mental disorders." *Hall v. Colvin*, __ F. Supp. 2d ___, 2014 WL 1832184, at *8 (D.R.I. May 8, 2014) (quoting AM-13066, at 6 (July 22, 2013)).

The administrative message indicates that the agency will continue to receive and consider GAF scores as opinion evidence when it comes from a medical source, but

> as with other opinion evidence, a GAF needs supporting evidence to be given much weight. By itself, the GAF cannot be used to "raise" or "lower" someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

*Lane v. Colvin*, No. C13-5658, 2014 WL 1912065, at *9 (W.D. Wash. May 12, 2014) (quoting AM-13066).

This is consistent with the agency's previous policy guidance, which provides that, even though a conclusory opinion by a treating physician is not entitled to controlling weight, it is nevertheless entitled to some weight. *See* Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *4;

*Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995); *Solock*, 2014 WL 2738632, at *6 ("[A]n ALJ should not 'give controlling weight to a GAF from a treating source unless it is well supported and not inconsistent with other evidence.'") (quoting AM-13066, at 5).

Another consideration addressed by the administrative message is the subjective nature of the GAF scale, which undercuts its reliability as a tool in reaching disability determinations. As the administrative message notes, "'GAF ratings assigned by different clinicians are inconsistent' and 'adjudicators cannot draw reliable inferences from the difference in GAF ratings assigned by different clinicians or from a single GAF score in isolation.'" *Hall*, 2014 WL 1832184, at *8 (quoting AM-13066, at 3). Although isolated GAF scores accompanied by more robust narrative support can be probative, or a series of GAF scores provided by the same clinician can provide a longitudinal picture of a claimant's mental functioning, individual GAF scores provided by different clinicians without explanation are ambiguous and unreliable, and it is error for an ALJ to rely on isolated GAF scores, rather than on more robust narrative findings and opinions, to credit or discredit other medical evidence. *See Hall*, 2014 WL 1832184, at *8.

Regardless,

in explaining the rationale for denying disability, the ALJ must demonstrate that he seriously considered and weighed the importance of the GAF scores. If the ALJ discounts the GAF score, he must specify his reasons for doing so. Moreover, the ALJ may not "cherry-pick" higher GAF scores in his analysis and ignore GAF scores that may support a disability.

*Rivera v. Astrue*, __ F. Supp. 2d ___, 2014 WL 1281136, at *7 (E.D. Pa. Mar. 27, 2014) (citations omitted).

## 1. Comparative Weight of Medical Opinions

Ms. Kroh contends that the ALJ improperly credited the medical opinion of Dr. Sadar, a non-examining state agency medical consultant, over those provided by the various

other physicians and psychologists who actually treated or examined Ms. Kroh. It is true that, generally, more weight is to be given to the opinions of an examining physician or psychologist than to the opinions of a non-examining one, and even more weight is generally given to the opinions of a treating physician or psychologist. *See* 20 C.F.R. § 404.1527(c)(1)&(2). But, "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." Soc. Sec. Ruling 96-6p, 1996 WL 374180, at *3. It is not necessarily error for an ALJ to afford more weight to the opinion of a state agency medical consultant over the opinions of treating and examining physicians or psychologists.

### 2. Dr. Newton's Opinion

Ms. Kroh contends that the ALJ failed to give appropriate weight to the opinion of Dr. Newton, her treating psychiatrist. In particular, she argues that the ALJ erroneously relied on her own lay opinion in rejecting Dr. Newton's medical opinion regarding Ms. Kroh's level of overall function. She contends that Dr. Newton's opinion was entitled to more than the "limited weight" afforded to it by the ALJ.

In many cases, a medical opinion expressed by a claimant's treating physician is entitled to controlling weight. To be entitled to "controlling weight" an opinion must come from a "treating source," it must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and it must be "not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527(a)(2); 20 C.F.R. § 404.1527(c)(2); Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *2. Under the Social Security regulations, a "treating source" is defined as a "physician, psychologist, or other acceptable

medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. As to what constitutes an "ongoing treatment relationship," the regulation states:

> Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).

> 20 C.F.R. § 404.1502.

If not well-supported by medically acceptable clinical and diagnostic techniques or inconsistent with other substantial evidence in the case record, a treating source medical opinion is nevertheless entitled to deference. Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *4. Ordinarily, it will be afforded "great weight." *See* Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *2; *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). *See generally* 20 C.F.R. § 404.1527(c) (detailing factors considered in evaluating weight given to a medical opinion).

Here, it is beyond dispute that Dr. Newton was a "treating source" whose medical opinion is ordinarily entitled to some degree of deference, if not controlling weight. The medical opinions at issue consist of three raw GAF scores, recorded in his treatment notes for September 9, 2011, October 7, 2011, and January 3, 2012. On these three occasions, Dr. Newton assessed Ms. Kroh's level of functioning with GAF scores of 50, 50, and 45, respectively, reflecting serious symptoms or serious impairment, as well as some deterioration in her mental status. In his treatment notes for the final office visit, Dr.

Newton noted that hospital admission might be necessary if the most recent adjustments to her medication did not prove effective.

The ALJ afforded "little weight" to the first GAF score of 50, explaining that it was based on "only one examination which is a very short treatment relationship," that, for unspecified reasons, Dr. Newton's "decent mental status examination" did not support the low GAF score assigned, and that it came only shortly after her release from a psychiatric hospital one month earlier and before any treatment by Dr. Newton had begun. The ALJ neglected to assess the second GAF score, which was recorded after Dr. Newton had begun treating Ms. Kroh. The ALJ afforded "little weight" to the third GAF score of 45, explaining that "if her score and functioning was really at 45, he would recommend admitting her then and there, not wait two weeks." The ALJ did not evaluate the three GAF scores together, insofar as they might provide a longitudinal picture of Ms. Kroh's mental functioning over a five month period during which she was being treated by Dr. Newton. Instead, she considered them only in isolation.

Here, the ALJ did not meaningfully address the GAF scores recorded by Dr. Newton in the course of his treatment of Ms. Kroh. Despite discrediting the September GAF score of 50 as having been based on too short of a treatment relationship, she failed to address the October GAF score, also a 50, which was consistent with the first, was one month further removed from Ms. Kroh's hospitalization, and followed after psychotropic treatment by Dr. Newton had begun. The ALJ also failed to consider the longitudinal picture painted by the three GAF scores of 50, 50, and 45, which were recorded over a five-month period of psychiatric treatment, and which appear to indicate deterioration — or at least a lack of progress — in Ms. Kroh's mental status despite psychiatric treatment.

The ALJ's rejection of the third, lowest GAF score is particularly troublesome. "[A]n ALJ may not make speculative inferences from medical reports. In addition, an ALJ is not free to employ her own expertise against that of a physician who presents competent medical evidence. When a conflict in the evidence exists, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason." *Plummer*, 186 F.3d at 429 (citations and internal quotation marks omitted); *see also Morales*, 225 F.3d at 317–18 ("[A]n ALJ may not make speculative inferences from medical reports," and "may [not] reject a treating physician's opinion" based on "speculation or lay opinion."); *Van Horn v. Schweiker*, 717 F.2d 871, 874 (3d Cir. 1983) ("[A]n ALJ is not free to set his own expertise against that of physicians who present competent medical evidence."); *Sklenar v. Barnhart*, 195 F. Supp. 2d 696, 700 (W.D. Pa. 2002) ("[A]n ALJ may not rely on his or her lay opinions to the detriment of the opinions of duly qualified medical professionals."). There is no medical evidence, nor any medical opinion, in the record to support the ALJ's conclusion that Dr. Newton's assessment of a 45 GAF score in January 2012 is inconsistent with his decision to defer admitting her to a hospital for two weeks, waiting instead to see if adjustment of her medications might yield an improvement to her mental status. *See Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) ("[I]f the ALJ believed that Dr. Scott's reports were conclusory or unclear, it was incumbent upon the ALJ to secure additional evidence from another physician.").

Because the ALJ failed to adequately consider and explain the weight given to each of the medical opinions rendered by Dr. Newton, Ms. Kroh's treating psychiatrist, the Court is unable to conclude that the ALJ's decision is supported by substantial evidence.

### 3. Dr. Klebe's Opinion

Dr. Klebe was Ms. Kroh's treating psychologist, from August 2011 through the date of the ALJ's decision. Between October 2011 and the ALJ's decision in January 2012, they met three times a week for psychotherapy. Dr. Klebe also provided inpatient psychotherapy to Ms. Kroh while she was hospitalized in August 2011. On January 3, 2012, Dr. Klebe provided a letter in which he expressed his opinion regarding her treatment prognosis, her ability to engage in gainful employment, and impairments to her ability to focus, maintain concentration, adapt to new environments, and interact socially with others. Ms. Kroh contends that the ALJ failed to address Dr. Klebe's medical opinion at all.

The ALJ afforded "little weight" to Dr. Klebe's opinion, but failed to set forth any explicit reason for discounting it. It is axiomatic that an ALJ must provide specific reasons for the weight given to a treating source's medical opinion. *See* 20 C.F.R. § 1527(c)(2); Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *5; *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). Failure to do so precludes a court from concluding that the ALJ's findings were supported by substantial evidence. *See Fargnoli*, 247 F.3d at 44.

Because the ALJ failed to provide specific reasons for rejecting the medical opinion of Dr. Klebe, Ms. Kroh's treating psychologist, the Court is unable to conclude that the ALJ's decision was supported by substantial evidence.

### 4. Dr. Sadar's Opinion

In her January 30, 2012, decision, the ALJ considered the medical opinion of Dr. Sadar, a non-examining state agency medical consultant who is also an expert in Social Security disability programs. Based on his review of Ms. Kroh's medical records, Dr. Sadar prepared a December 15, 2010, assessment of Ms. Kroh's RFC, which the ALJ ultimately

afforded "great weight." The ALJ's RFC determination largely tracked Dr. Sadar's RFC assessment, albeit with some additional limitations taken from Dr. O'Connell's November 2010 report, the only other medical evidence that explicitly addressed Ms. Kroh's functional limitations. Other than conclusory GAF scores, no other medical opinion was afforded anything more than "little weight."

An RFC form prepared by a non-examining state agency medical consultant cannot constitute substantial evidence where it is not based upon the full medical record before the ALJ at the time of hearing and decision, particularly where the medical evidence suggests a deterioration in the claimant's condition. *See Frankl v. Shalala*, 47 F.3d 935, 937–38 (8th Cir. 1995) (state agency RFC form based on medical records through September 1990, prior to deterioration in claimant's condition, did not constitute substantial evidence of his ability to perform a full range of light work at the time of his December 1991 hearing); *see also Oliver v. Astrue*, No. 07-1733, 2008 WL 4646125, at *2 (W.D. Pa. Oct. 17, 2008) (remanding case for development of medical evidence where the only medical findings regarding the claimant's RFC were underdeveloped) (citing *Frankl*). Here, Dr. Sadar's RFC assessment was prepared on December 15, 2010, thirteen months before the administrative hearing and decision in this case. Prior to that, her only psychiatric evaluation or treatment had been a single visit with Dr. Okamoto in September 2009, in which he adjusted the medication regimen prescribed by her primary care physician, and an evaluation by state agency consulting psychologist Dr. O'Connell in November 2010.

Prior to Dr. Sadar's RFC assessment in December 2010, Ms. Kroh had experienced no episodes of decompensation, and she denied any suicidal ideation. In the year following Dr. Sadar's RFC assessment, Ms. Kroh appears to have experienced multiple episodes of

41

decompensation.[22] She was hospitalized twice for psychiatric treatment, her psychotropic medications were adjusted several times to address her deteriorating mental status, she began psychotherapy — an avenue of treatment she had declined to pursue in 2009 due to insurance issues — and reports of suicidal ideation, however "nebulous," became a hallmark of her mental health treatment records. During that period, her GAF scores, for what they're worth,[23] also appear to have fluctuated greatly. Her GAF score upon admission to a psychiatric hospital in July 2011 was not recorded, but her admission suggests significant impairment in her overall functioning. Upon discharge three days later, she was assessed by Dr. Welton with a 61-70 GAF. A few weeks later in August 2011, she was admitted to the hospital again for psychiatric treatment and assessed by Dr. Joshi with a 20 GAF at that time. Dr. Joshi then assessed her with a 55 GAF upon discharge after nine days of inpatient treatment. Ms. Kroh then began outpatient treatment with Dr. Newton, who initially gave her a GAF score of 50 at the start of treatment in September 2011, a second GAF score of 50 in October 2011, and a GAF score of 45 in January 2012. During the intervening months, Dr. Newton had adjusted her medication multiple times and Dr. Klebe

---

[22] "*Episodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode." 20 C.F.R. pt. 404, subpt. P. app. 1, § 12.00(C)(4).

[23] Although less than pellucid, raw GAF scores without further narrative explanation are the only explicit assessment of Ms. Kroh's level of functioning found in her medical records for this period.

had been seeing her three times a week for psychotherapy. On January 3, 2012, Dr. Newton expressed his concern that another hospitalization was imminent.

Based on this record, in which Ms. Kroh's mental status appears to have deteriorated significantly in the intervening period, Dr. Sadar's December 2010 RFC assessment simply does not constitute substantial evidence of Ms. Kroh's RFC at the time of her hearing and the ALJ's decision in January 2012, as it was not based on her full medical record.

### 5. The ALJ's Evaluation of GAF Scores in General

Implicit in Ms. Kroh's arguments is an objection to the ALJ's cherry-picking of GAF scores. With little to distinguish one GAF score taken in isolation from another, the ALJ found GAF scores of 20, 30, 45, and 50 — indicating, at a minimum, serious symptoms or impairments — to be entitled to "little weight," a single GAF score of 50 to be entitled to "some weight," and GAF scores of 55 and 61–70 — indicating mild or moderate symptoms or impairments — to be entitled to "great weight." Interestingly, both scores given "great weight" represented Ms. Kroh's level of function upon discharge from psychiatric hospitals, after having received several days of inpatient treatment. All other GAF scores followed periods of outpatient treatment only. This pattern alone suggests that the ALJ's decision may not be supported by substantial evidence. *See Rivera*, 2014 WL 1281136, at *7.

Moreover, having found that Dr. Sadar's non-examining report cannot constitute substantial evidence to support the ALJ's RFC determination, the only remaining items of evidence afforded substantial weight by the ALJ are the conclusory discharge GAF scores of 61–70, assigned by Dr. Welton, and 55, assigned by Dr. Joshi, both of which were afforded "great weight" by the ALJ. Standing in isolation, these unexplained GAF scores do not

constitute substantial evidence in support of the ALJ's RFC determination. *See Hall*, 2014 WL 1832184, at *8.

Although not addressed by Ms. Kroh, the Court further notes that the ALJ's rejection of Dr. Joshi's opinion assigning a GAF score of 20 to Ms. Kroh upon her admission for inpatient psychiatric treatment is also problematic. Ms. Kroh was admitted due to "[i]ncreasing depressed mood with suicidal thoughts/plan to overdose on medication." (Admin. Tr. 623, Doc. 9-10, at 124). The ALJ discounted this GAF rating solely for the stated reason that "it was not a suicide attempt, but only a wish to be dead with a nebulous plan to overdose on medication and a depressed mood." (Admin. Tr. 297, Doc. 9-4, at 66). For one, this represents another instance of improper reliance by the ALJ on speculation or her own lay opinion, to the detriment of competent medical opinion evidence provided by a duly qualified medical professional. *See Morales*, 225 F.3d at 317–18; *Plummer*, 186 F.3d at 429; *Van Horn*, 717 F.2d at 874; *Sklenar*, 195 F. Supp. 2d at 700. But it is also simply wrong. A GAF rating of 20 "represents some danger of hurting self or others." *Schwartz*, 2014 WL 257846, at *5 n.15. An actual suicide attempt would be indicative of an even lower GAF score, in the 1 to 10 range. *See Schwartz*, 2014 WL 257846, at *5 n.15 ("A GAF score of 1 to 10 denotes a persistent danger of severely hurting oneself or persistent inability to maintain minimal personal hygiene or *serious suicidal act with clear expectation of death*.") (emphasis added).

## V.  CONCLUSION

Based on the foregoing, the Court finds that the ALJ's determination that Ms. Kroh retained the RFC necessary to perform her past relevant work as a laborer in a water-bottling business is not supported by substantial evidence.

Accordingly, the Commissioner's decision shall be **REVERSED** and **REMANDED** for further proceedings. On remand, the Commissioner will be directed to "reopen and fully develop the record before rendering a ruling" on the Plaintiff's claim. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798, 800 (3d Cir. 2010).

A remand under sentence four of 42 U.S.C. § 405(g) requires the Court to enter a separate final judgment "affirming, modifying, or reversing the decision of the Commissioner" pursuant to Rule 58 of the Federal Rules of Civil Procedure. *See Shalala v. Schaefer*, 509 U.S. 292, 296–97 (1993); *Kadelski v. Sullivan*, 30 F.3d 399, 401 (3d Cir. 1994). Accordingly, the Clerk will be directed to enter judgment reversing the decision of the Commissioner.

An appropriate order shall follow.

Dated: September 4, 2014                                   *s/ Karoline Mehalchick*

                                                           **KAROLINE MEHALCHICK**
                                                           **United States Magistrate Judge**